UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| LORI B. TURNER, ) | |
| (Social Security No. XXX-XX-4266), ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 3:08-cv-162-WGH-RLY |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 10,

15) and an Order of Reference entered by District Judge Richard L. Young on

March 4, 2009 (Docket No. 16).

## I.  Statement of the Case

Plaintiff, Lori B. Turner, seeks judicial review of the final decision of the

agency, which found her not disabled and, therefore, not entitled to

Supplemental Security Income ("SSI") benefits under the Social Security Act ("the

Act").  42 U.S.C. § 1381(a); 20 C.F.R. § 404.1520(f).  The court has jurisdiction

over this action pursuant to 42 U.S.C. § 1383(c)(3).

Plaintiff applied for SSI on June 17, 2005, alleging disability since March

28, 2005.  (R. 44-46).  The agency denied Plaintiff's application both initially and

on reconsideration.  (R. 30-37).  Plaintiff appeared and testified at a hearing before Administrative Law Judge M. Kathleen Gavin ("ALJ") on May 22, 2008. (R. 295-310).  Plaintiff was represented by an attorney; also testifying was a vocational expert ("VE").  (R. 295).  On June 23, 2008, the ALJ issued her decision finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform several jobs in the regional economy.  (R. 6-15).  The Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner.  (R. 2-4).  20 C.F.R. §§ 404.955(a), 404.981.  Plaintiff then filed a Complaint on October 16, 2008, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Plaintiff was 38 years old at the time of the ALJ's decision and had a high school education.  (R. 14).  She has no job skills because she does not have past relevant work.  (R. 14).

### B.  Medical Evidence

#### 1.  Mental Impairments

On April 6, 2004, Plaintiff visited Jennifer D. Simoneaux, M.D., with complaints of being very tired and depressed.  (R. 279).  During the visit, Plaintiff stated that she has crying spells for no reason and thinks they are linked to depression.  (R. 279).  Dr. Simoneaux diagnosed Plaintiff with depression and

prescribed her 25 mg of Zoloft per day for a week and thereafter increased the dosage to 50 mg.  (R. 279).

Plaintiff received a mental status examination on August 2, 2005, at Healthsouth Rehabilitation Hospital.  (R. 205-07).  Robert L. Wilson, EdD, performed an examination at the request of the Disability Determination Bureau. His clinical impression was that Plaintiff met the diagnostic criteria for Attention-Deficit/Hyperactivity Disorder ("ADHD").  (R. 207).  Clinical signs observed by Dr. Wilson were:  "failure to attend to detail, lack of sustained attention, disorganization, easily distracted, forgetful in most activities, excessive/loud talking, interrupts, fails to wait for full question/explanation, restlessness.  Additionally, she demonstrates some depressive signs:  depressed mood, irritability, anergia, low self-esteem, and amotivation."  (R. 207). Dr. Wilson diagnosed Major Depressive Disorder, Borderline Intellectual Functioning, and a Global Assessment of Functioning ("GAF") of 40.  (R. 207).

Plaintiff appeared at the Lampion Center on November 28, 2005, and was evaluated by clinical therapist, Mary Pat Hatley, MSW.  (R. 222-26).  She noted that Plaintiff's affect was subdued and sluggish, leading to a diagnosis of Major Depressive Disorder with atypical features, recurrent, moderate, and a GAF of 56.  (R. 224-25).  Plaintiff reported sleeping difficulties.  (R. 222).  Hatley documented Plaintiff's mention that she slept many hours and didn't get out of bed until the afternoon hours.  (R. 222).  Plaintiff further stated that she has two daughters that live with her, and they have noticed that she has difficulty

waking up and being productive throughout the day.  (R. 222, 225).

Additionally, it was noted that Plaintiff sometimes cries for no reason and has

feelings of worthlessness.  (R. 225).

On February 8, 2006, Plaintiff received an assessment from Kimberly

Arvin, ACSW, LCSW, at Southwestern Indiana Mental Health Center.  (R. 209-

10).  Arvin's clinical impression described Plaintiff as having trouble staying on

task and staying focused with fragmented thoughts, fidgetiness, distractibility,

and poor organization skills.  Plaintiff has low energy and is depressed on an

ongoing basis, with low self-worth.  (R. 210).  A diagnosis of Mood Disorder, NOS

for primary and secondary, and Adult ADHD was recommended.  (R. 210).

Plaintiff was given a GAF of 55.  (R. 210).  Additionally, during  a subsequent

meeting with Arvin, Plaintiff stated that her mind was going in so many

directions that she was having difficulty focusing or keeping things together.  (R.

190).

On February 14, 2006, F. Beth Stone, Ph.D., of Southwestern Indiana

Mental Health Center countersigned the Report of Psychiatric Status prepared

by Mary Pat Hatley, who saw Plaintiff and noted that she talked in a flat and

depressed tone using speech that was very active but not always relevant.  (R.

213-19).  Plaintiff seemed alert but had periods of clouded thought, often losing

track of a story as she told it and getting off the point.  (R. 214).  Additionally,

Plaintiff sleeps many hours of the day, not getting out of bed until after noon,

cries for no reason, has feelings of worthlessness, and experiences unpredictable

mood swings.  (R. 214).  Furthermore, Hatley opined that Plaintiff's functional capacity is compromised due to her limited ability to begin tasks, and she is often unable to maintain focus to complete them.  (R. 217).  Her unstable moods make relationships difficult, and she has a hard time maintaining a daily routine and keeping commitments, including appointments for therapy.  (R. 217).  Plaintiff has difficulty focusing and learning, which combined with lack of motivation renders maintenance of a daily routine difficult.  (R. 217).  Additionally, Plaintiff has chosen social isolation due to lack of transportation and home schooling her child.  (R. 217).

A psychiatric evaluation performed on March 28, 2006, by James P. Given, M.D., revealed that Plaintiff had Major Depressive Disorder, recurrent, mild.  (R. 187).  Dr. Given stated that some consideration should be given to dysthymia and Plaintiff's difficulty in concentration may be due to her depression.  (R. 187).  He further noted that Plaintiff had trouble initiating and maintaining sleep for the last two to three months.  Dr. Given also stated that Sominex has been little help in this regard, and Plaintiff has been sleeping ten to 11 hours in a 24-hour period, which is more than usual.  He further commented that his plan of treatment for Plaintiff includes that she refrain from taking naps throughout the day and perform better sleep hygiene.  (R. 186-87).

On April 27, 2006, Willard Whitehead III, M.D., noted that Plaintiff has a hard time shutting down and sleeping at night and suggested running a trial period of Clonodine to see if that would help her settle down and get through the

evening more comfortably.  On a follow-up visit on August 1, 2006, Dr. Whitehead stated that Plaintiff was still having difficulty sleeping at night, and she feels anxious throughout the day.  (R. 183).  On that same visit, Dr. Whitehead increased her dose of Clonodine to see if it would improve her sleep.

On March 15, 2007, Dr. Whitehead again examined Plaintiff and found that the Clonodine was still not helping her sleep, and she was unable to relax throughout the day.  He decided to switch her from Clonodine to Risperdol.  (R. 173).  On a follow-up visit to Dr. Whitehead on June 14, 2007, Plaintiff stated that she had been sleeping approximately 12 hours per night and felt groggy when she woke up.  (R. 158).  Dr. Whitehead further felt that Ritalin may not be working in this regard and changed Plaintiff's prescription to Adderall.  (R. 158).

On September 13, 2007, Dr. Whitehead noted that sleep remains elusive, and it takes a long time for Plaintiff to fall asleep.  She wakes up a lot in the course of the night, sleeps later into the day, and feels tired the rest of the day despite the Adderall she was prescribed at the prior visit.  (R. 149).

Plaintiff mentioned her sleep difficulties to her individual therapist, Khara Williams, on several occasions.  (R. 148, 162, 170).  Additionally, Plaintiff complained of mood swings to Williams on August 13, 2007.  (R. 153)

Throughout Plaintiff's treatment she was prescribed Zoloft 25 mg for her anxiety and depression, which was increased to 50 mg and eventually 100 mg. (R. 275-76, 279).  Plaintiff was also prescribed Effexor XR, Clonodine, and

Straterra by Dr. Whitehead.  The Straterra was eventually discontinued because of its ineffectiveness.  (R. 135).

### 2. Physical Impairments

In addition to the psychiatric limitations on Plaintiff's daily life, there are also some physical limitations as well.  It is noted that Plaintiff gets dizzy and short of breath very easily.  (R. 83).  On April 6, 2004, Plaintiff complained of being very tired to her treating physician, Dr. Simoneaux.  (R. 271, 279).  On June 17, 2005, an exercise stress test was performed by R. Scott Starrett, M.D., at the Heart Group, finding that Plaintiff did have a moderate reduction in exercise capacity for her age due to her symptoms of fatigue and dizziness.  (R. 249).  However, after complaints of chest pain, Plaintiff underwent an echocardiograph on July 14, 2005, which showed normal results.  (R. 234).  In September, Plaintiff saw Evelyn Bose, M.D., because she still had chest pain.  (R. 201).  Dr. Bose opined that the chest pain was non-cardiac in origin and found no limitations in her daily life activities.  (R. 203).

In March of 2004, Plaintiff began complaining of knee pain after she fell.  (R. 280).  Plaintiff rated her pain to the touch at two out of five, but did not necessarily have pain when walking.  (R. 280).  An x-ray was ordered by Dr. Simoneaux which showed no fracture or dislocation and minimal degenerative change.  (R. 289).  On March 6, 2006, Plaintiff was prescribed a knee brace for her right knee after an examination by Dr. Simoneaux.  (R. 113-14).  On June 12, 2006, Plaintiff complained of right knee pain to Dr. Simoneaux, and an x-ray

was ordered.  (R. 113-14).  The x-ray was negative, showing no evidence of acute fracture or dislocation and no significant degenerative changes.  (R. 123).  In December of 2006, Plaintiff saw James E. Goris, M.D., complaining of stabbing pain in both knees.  (R. 100).  Dr. Goris described Plaintiff as being overweight at 209.8 lbs. and noted that she had moderate crepitance.  (R. 100).  Dr. Goris also noted that Plaintiff was limited in her ambulatory ability, secondary to her stabbing anterior knee pain.  (R. 133).  Dr. Goris opined that surgery was not necessary and that Plaintiff may benefit from rehabilitation exercises to help alleviate her pain.  (R. 100, 101, 133-34).

Plaintiff complained to Dr. Simoneaux on November 3, 2004, of having a lot of headaches with a little bit of dizziness, mostly in the front part of her head. (R. 276).  On March 1, 2005, Plaintiff again complained to Dr. Simoneaux of having daily headaches which she felt may be related to tension and stress.  (R. 275).  Her physician noted that Plaintiff has a history of migraine headaches and prescribed Immitrex.  (R. 275).  On May 31, 2005, Plaintiff was seen by the Deaconess Family Medical Center and the physician's clinical impression was that of migraine headaches along with other conditions.  (R. 273-74).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also Perkins v.*

*Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant

work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

### V.  The ALJ's Decision

The ALJ concluded Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. 11). The ALJ found that, in accordance with 20 C.F.R. § 416.920(c), Plaintiff had two impairments that are classified as severe: ADHD and depression. (R. 11). The ALJ concluded that these impairments did not meet or medically equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 11). Consequently, the ALJ concluded that Plaintiff retained the RFC to perform a full range of work at all exertional levels, but with the following nonexertional limitations:  The claimant is limited to simple, one-two step tasks without strict production requirements and that require only minimal contact with the public. (R. 12). The ALJ opined that Plaintiff has no past relevant work. (R. 14). The ALJ found that Plaintiff retained the RFC for a significant number of jobs in the regional economy, including 4,000 laundry worker jobs, 9,000 janitor/cleaner jobs, and 3,700 dietary aide jobs. (R. 15). The ALJ concluded by finding that Plaintiff was not under a disability. (R. 15).

## VI.  Issues

Plaintiff has raised three issues.  The issues are as follows:

1.     Whether the ALJ should have given controlling weight to Plaintiff's physicians.

2.     Whether the ALJ's RFC assessment is supported by substantial evidence.

3.     Whether the VE provided jobs that did not meet the RFC given by the ALJ.

**Issue 1:     Whether the ALJ should have given controlling weight to Plaintiff's physicians.**

Plaintiff argues that the ALJ failed to give appropriate weight to the opinions of treating and examining physicians.  Opinions of a treating physician are generally entitled to controlling weight.  *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).  However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record.  *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001).  Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

> (d)  *How we weigh medical opinions.*  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

> (1)  *Examining relationship.*  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2)  *Treatment relationship.*  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i)  *Length of the treatment relationship and the frequency of examination.*  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  *Nature and extent of the treatment relationship.*  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) *Supportability.*  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.*  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.*  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors.*  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

*****

(f) *Opinions of nonexamining sources.*  We consider all evidence from nonexamining sources to be opinion evidence.  When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (e) of this section.  In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

-13-

(1)  In claims adjudicated by the State agency, a State agency medical or psychological consultant (or a medical or psychological expert (as defined in § 405.5 of this chapter) in claims adjudicated under the procedures in part 405 of this chapter) will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in appendix 1 to this subpart, and your residual functional capacity.  These administrative findings of fact are based on the evidence in your case record but are not themselves evidence at these steps.

20 C.F.R. § 404.1527.

As an initial matter, Kim Arvin, ACSW, is a social worker not a doctor. Therefore, no controlling weight need be given to her medical opinions.  As to Dr. Stone and Dr. Wilson, their opinions tend to show that Plaintiff had problems with multi-step tasks.  The decision of the ALJ to limit Plaintiff to "simple one-two step tasks without strict production requirements" is not inconsistent with the opinions of Dr. Stone and Dr. Wilson.  Dr. Stone stated that Plaintiff had "limited ability to begin tasks and [is] often unable to maintain focus to complete tasks." (R. 217).  Dr. Wilson's clinical impression observed Plaintiff's "failure to attend to detail, lack of sustained attention, disorganization, easily distracted, forgetful in most activities, excessive/loud talking, interrupts, fails to wait for full question/explanation, restlessness." (R. 207).  While these statements do indicate that Plaintiff does have limited focus and concentration, they do not definitively preclude Plaintiff from being able to complete even simple one-two

step tasks.  Therefore, the ALJ reasonably limited Plaintiff based on the statements by Dr. Stone and Dr. Wilson.

**Issue 2:     Whether the ALJ's RFC assessment is supported by substantial evidence.**

Plaintiff also found fault with the ALJ's assessment of Plaintiff's RFC. Specifically, Plaintiff claims that the ALJ failed to list any medical opinions to support the RFC given to the Plaintiff.  Plaintiff also argues that the RFC fails to take into account Plaintiff's severe impairments and does not include evidence favorable to Plaintiff.

Despite Plaintiff's concerns, the medical evidence in the record supports the RFC given.  The RFC is not determined by a physician, but is a determination reserved for the ALJ.  20 C.F.R. §§ 416.927(e)(1)-(3) (2009).  In this case, the ALJ specifically cites to four medical experts in her decision as follows:

(a)     Dr. Wilson found that claimant had the following symptoms: a failure to attend to details, lack of sustained attention, disorganization, she was easily distracted, forgetful in most activities, excessive/loud talking, interrupted, failed to wait for full question/explanation, restlessness.  (R. 13).

(b)     Kim Arvin, ACSW, found that claimant had problems staying on task and staying focused with fragmented thoughts, fidgetiness, and distractibility with poor organizational skills. (R. 13).

(c)     Dr. Given noted claimant's depression to be mild; her attention, language, and memory were all intact; and her thought processes did not have psychotic features.  (R. 14).

(d)     State psychological experts opined that claimant's ADHD and depressive disorder were not severe impairments based on finding that claimant had mild restriction of activities of daily living; mild difficulty maintaining concentration, persistence, or pace; and no difficulties maintaining social functioning. (R. 14).

As for Plaintiff's mental impairments, the above cited medical evidence from the record supports the limitation to simple one-two step tasks without strict production requirements which require only minimal contact with the public. This medical evidence does indicate that Plaintiff has mental issues, but they do not rise to the level of her being incapable of completing one-two step tasks. Furthermore, none of Plaintiff's treating or examining physicians clearly stated that Plaintiff was more limited.

As for Plaintiff's physical impairments, Plaintiff's stress test did show a moderate reduction in exercise capacity for her age. (R. 249). However, an echocardiograph on Plaintiff showed normal results, and Dr. Bose opined that Plaintiff's chest pain was non-cardiac in origin, and she had no physical limitations in her daily life activities. (R. 203). Dr. Bose found that Plaintiff is able to care for her two children, able to drive, has no problems lifting or carrying weight, sitting, standing, walking, pushing, or pulling, and her hearing, vision, and speech are normal. (R. 203). The medical evidence surrounding Plaintiff's knee problems includes a finding of no fracture/dislocation and "minimal" degenerative change by Dr. Simoneaux (R. 289), and findings by Dr. Goris that surgery is not necessary and that Plaintiff would benefit from

rehabilitative exercises (R. 100-01, 133-34).  These findings support an inference that the pain described by Plaintiff does not significantly limit her ability to walk or stand.

Based on this medical evidence, the ALJ appears to have conducted a sound and thorough assessment of Plaintiff's RFC and come to the conclusion that Plaintiff had no physical limitations that diminished her RFC.  Plaintiff has provided no objective medical evidence that obligated the ALJ to find a more restricted RFC, and the court can trace the path of the ALJ's reasoning.

**Issue 3:    Whether the VE provided jobs that did not meet the RFC given by the ALJ.**

Finally, Plaintiff argues that the ALJ's decision is flawed because the VE testified that Plaintiff could perform jobs that were not consistent with a RFC of "simple, one-two step tasks without strict production requirements and that requires only minimal contact with the public."  However, this RFC is compatible with each of the jobs listed.  First, the jobs given by the VE were simple enough to satisfy the RFC for "simple, one-two step tasks without strict production requirements."  While each of the jobs provided by the VE might require several tasks, none of the tasks themselves are more than simple tasks.  This is demonstrated by the Specific Vocational Preparation ("SVP") required for each of these jobs.[1] The following is an explanation of the SVP:

---

[1]SVP is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire information, and develop the facility needed for average performance in a specific job-worker situation.

| Level | Time |
|---|---|
| 1 | Short demonstration only |
| 2 | Anything beyond short demonstration up to and including 1 month |
| 3 | Over 1 month up to and including 3 months |
| 4 | Over 3 months up to and including 6 months |
| 5 | Over 6 months up to and including 1 year |
| 6 | Over 1 year up to and including 2 years |
| 7 | Over 2 years up to and including 4 years |
| 8 | Over 4 years up to and including 10 years |
| 9 | Over 10 years |

Dictionary of Occupational Titles ("DOT"), Appendix C, *available at*

http://www.occupationalinfo.org/appendxc_1.html (Revised June 5, 2003).

Laundry worker (361.687-014), dietary aide (319.677-014), and janitor/cleaner (381.687-018) are all rated as a SVP category 2, which is anything beyond short demonstration up to and including one month.  This rating shows that jobs in this category are some of the simplest available and supports the VE's testimony matching these jobs with the RFC of one-two step tasks given by the ALJ.

Secondly, there is also evidence that the ALJ's decision to limit Plaintiff to "minimal contact with the public" is compatible with the VE's testimony that Plaintiff can perform work as a laundry worker, janitor/cleaner, or dietary aide. None of these jobs require more than minimal contact with the public given the fact that the DOT places these jobs in the category of only minimal people skills. The following excerpt from Appendix B of the DOT explains the degree of interaction with people required for a specific job:

The fourth, fifth, and sixth digits of the occupational code reflect relationships to Data, People, and Things, respectively.  These digits express a job's relationship to Data, People, and Things by identifying the highest appropriate function in each listing shown in the following table:

\* \* \* \* \*

PEOPLE:  Human beings; also animals dealt with on an individual basis as if they were human.

0 Mentoring:  Dealing with individuals in terms of their total personality in order to advise, counsel, and/or guide them with regard to problems that may be resolved by legal, scientific, clinical, spiritual, and/or other professional principles.

1 Negotiating:  Exchanging ideas, information, and opinions with others to formulate policies and programs and/or arrive jointly at decisions, conclusions, or solutions.

2 Instructing:  Teaching subject matter to others, or training others (including animals) through explanation, demonstration, and supervised practice; or making recommendations on the basis of technical disciplines.

3 Supervising:  Determining or interpreting work procedures for a group of workers, assigning specific duties to them, maintaining harmonious relations among them, and promoting efficiency.  A variety of responsibilities is involved in this function.

4 Diverting:  Amusing others, usually through the medium of stage, screen, television, or radio.

5 Persuading:  Influencing others in favor of a product, service, or point of view.

6 Speaking-Signaling:  Talking with and/or signaling people to convey or exchange information.  Includes giving assignments and/or directions to helpers or assistants.

7 Serving:  Attending to the needs or requests of people or animals or the expressed or implicit wishes of people.  Immediate response is involved.

> 8 Taking Instructions-Helping:  Attending to the work assignment
> instructions or orders of supervisor.  (No immediate response
> required unless clarification of instructions or orders is needed.)
> Helping applies to "non-learning" helpers.

DOT, Appendix B, *available at*  http://www.occupationalinfo.org/appendxb_1.

html (Revised June 5, 2003).  Laundry worker (361.687-014) and janitor/cleaner

(381.687-018) both have a relationship to people rating of 8, which is the lowest

rating and equated to simply taking instructions.  Anyone in the workforce must,

at a minimum, be able to take instructions from a supervisor.  Dietary aide

(319.677-014) has a relationship to people rating of 7, which is the next level

higher and equates to serving.  The laundry worker and janitor/cleaner

positions, as described in the DOT, do not require even minimal contact with the

public, and the dietary aide position only involves the minimal interaction of

serving people.  Therefore, the ALJ was not in error for accepting the testimony

of the VE.

## VII.  Conclusion

For the reasons discussed above, the ALJ was not obligated to grant

controlling weight to the opinions of Kim Arvin, Dr. Stone, or Dr. Wilson.

Additionally, the ALJ's assessment of Plaintiff's RFC is supported by substantial

evidence.  Finally, the ALJ's decision concerning the jobs available for plaintiff to

perform is supported by the testimony of the VE.  Consequently, there are no

errors warranting reversal or remand.  The decision of the Commissioner is

**AFFIRMED**, and the case is **DISMISSED.**  Each party shall bear its own costs.

　　　　　**SO ORDERED** the 9th day of November, 2009.

_____
William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

John Ryan Worman
WOODS & WOODS, LLP
jworman@woodslawyers.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov